UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **GEANARD E. HOWARD,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No. 4:18-cv-02024-SNLJ |
| **MATT STURM, et al.,** | ) ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter comes to the Court on thirty-seven motions, the balance of which encompass defendants' several summary judgment motions. Before getting to those motions, this Court will address the motions that would not otherwise be mooted by summary judgment if granted:

- Both of plaintiff's motions to amend his complaint (ECF #32, 38) will be **DENIED**. The first attempts to add three defendants to this action, but none are alleged to have done anything wrong in the context of plaintiff's claims; in fact, no cognizable claim has been made against them. The second attempts to add yet another defendant to this action, Alana Boyles as "director [of the] division of adult institutions," but again plaintiff does not make clear what involvement that person has in his claims—to the contrary, plaintiff seems to implicate, instead, the "*deputy* director," who is unnamed and not brought as a defendant. This Court discerns no reason why justice requires granting plaintiff's motions. *See* FED. R. CIV. P. 15(a)(2).

1

- Defendant Matt Sturm has separately moved for summary judgment (ECF #33), to which plaintiff has uniquely responded by filing a motion to dismiss Sturm (ECF #39). Plaintiff admits "Sturm did not take part[] and was not involved in" the allegations underlying plaintiff's claims. Plaintiff's motion to dismiss is **GRANTED**, and Sturm's motion for summary judgment is **DENIED AS MOOT**. Given plaintiff's admission, Sturm will be **dismissed with prejudice.** Plaintiff's motion also seeks to replace Sturm with Boyle (the director referenced above in plaintiff's motions to amend) but, again, plaintiff provides no facts tending to explain how Boyle is involved in the allegations underpinning plaintiff's claims.

All other motions pertain to extensions of time, leave to file in excess of page limits, discovery disputes, further attempts to have court-appointed counsel (plaintiff admits he has "made no effort" to obtain counsel himself), and various miscellaneous motions asking the court to examine various documents. The Court has carefully read each motion, but finds all are appropriately denied as moot in light of the record before this court on defendants' three remaining summary judgment motions, which will be granted. (ECF #43, 49, 61). Accordingly, the following motions are **DENIED AS MOOT**: ECF #54, 55, 57, 58, 66, 67, 68. 70, 74, 76, 79, 80, 81, 82, 83, 85, 86, 89, 90, 95, 96, 97, 98, 99, 102, 105, 108, 111, 113, 114.

## I. BACKGROUND

Plaintiff, an inmate of the Missouri Department of Corrections ("MDOC"), wishes to view and read material involving sexualized content. Such content has traditionally been banned in correctional facilities. But, plaintiff says he "learnt of a company" that

sells "sexually explicit magazines redesigned to conform to facility requirements." A few of those magazines that plaintiff attempted to purchase include "Play Girls Pictorial," "The Pole," "Plush XL-Large Ladies," and "Black Legs." These magazines were intercepted by the various facilities plaintiff has spent time at, including South Eastern Correctional Center (SECC), North Eastern Correctional Center (NECC), South Central Correctional Center (SCCC), Tipton Correctional Center (TCC), Boonville Correctional Center (BCC), and Farmington Correctional Center (FCC). In each magazine, various pages would be "censored for explicit sex acts." Plaintiff says he also requested catalogs that "gives offenders the option to order [] photos [] which contain nudity." These, too, were censored. Plaintiff says the censorship was often arbitrary. Depending on what facility he was at, some facilities would allow plaintiff to keep material only for others to later confiscate it (this appears to be a rare phenomenon, as only a few instances are mentioned). Plaintiff also notes how a book like "Hot & Pervy Paris Girls" would be censored while something like "The Penis Book" would not, a result plaintiff finds capricious. Confused, plaintiff wrote on at least one occasion to one of the publishing companies, "Special Needs X-Press," asking why certain pages of "Plush XL-Large Ladies" were censored. Plaintiff reports that of the pages censored, two were "stories" and two were "photos of models posing in a professional manner."

    Fed up with not receiving the magazines and catalogs he says he is entitled to, plaintiff brings this action to challenge the alleged unconstitutional censorship he has suffered; thus, plaintiff brings a claim under the First Amendment. And in doing so, he demands "$10,000 against each defendant jointly and severally."

Defendants Matt Sturm (MDOC Deputy Director), Terry Webb (FCC Censorship Committee), Cybelle Webber (TCC Censorship Committee), Tim Burris (TCC Censorship Committee), and Cindy Griffith (BCC Censorship Committee) remain in this case following Section 1915A review. (ECF #7). All seek summary judgment. As explained above, plaintiff has chosen to voluntarily dismissed Sturm, admitting he played no part in the dispute. That leaves three remaining motions for summary judgment—one for the defendants of each facility (FCC, TCC, and BCC)—that mostly overlap in argument. All aver that Standard Operation Procedure ("SOP") 13-1.2, which contains guidelines on censoring sexually explicit material, is a "legitimate and neutral" regulation that bears a "rational relationship to the valid penological objectives" of preventing sexually explicit material to circulate in the prison system. Defendants collectively point to the "goals of safety, security, and maintaining an appropriate work environment for prison employees." All say they were simply abiding by SOP 13-1.2 when censoring the at-issue material.

The most critical set of facts, then, relate to the particular content of the censored material. Plaintiff makes clear that he lodges an as-applied challenge, meaning it is defendants' specific acts of censorship, and not the censoring policy at large, that takes center stage. Indeed, in an as-applied challenge "we consider whether a ban on *[the] particular items* is reasonably related to a legitimate penological objective." *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015). Thus, plaintiff urges the Court to "review the contents of each item to determine whether [defendants'] censorship is an 'exaggerated response.'" It makes sense, of course, for plaintiff to make an as-applied

4

challenge over a facial challenge, as the latter has already been rejected by the Eighth Circuit. *See Dean v. Bowersox*, 325 Fed.Appx. 470 (8th Cir. 2009) (noting previous caselaw finding a "legitimate government interest behind [sexually explicit material] regulations" and affirming dismissal of plaintiff's facial challenge to them). Even so, "a facially valid regulation may be invalid if it is applied to the particular items in such a way that negates the legitimate concerns." *Murchison*, 779 F.3d at 887.

The question, thus, comes down to what defendants censored, why, and what they did to accommodate if anything. With each motion, a separate statement of facts and supporting affidavits were submitted elucidating this matter:

- Defendant Burris served on the FCC Censorship Committee. He "served on the censorship committee when it censored the Mailers Ad Group Catalogue which [plaintiff] ordered." The Mailers Ad Group Catalogue was censored "because of a page with information on how to order prohibited sex toys and sex pills. The page had images of the sex toys and sex items." He also "served on the censorship committee when it censored the Pole Lifestyle Guide Magazine (Pole Magazine) which [plaintiff] ordered." A story titled "Check" by Nicolette Ganadu was censored because it pertained to "individuals masturbating and doing oral sex and anal sex acts." Both the magazine and catalogue were censored in total because "it was not a workable alternative for staff to cut out from catalogues and magazines, etc., the images, text, parts of pages, or whole pages with sexually explicit material." It would "burden staff with extra work" to do so and "lead to disputes

5

and litigation since inmates would allege that staff cut out non-sexually explicit material, or [] otherwise defaced the inmate's property." (ECF #43-1, Ex. 1, 2, 5).

- Defendant Griffith served on a censorship committee at MDOC's main office. She was tasked with reviewing "Plush XL Large Ladies, No. 4 Magazine." That magazine contained "an article by Juicy," which "described [a] sexual encounter with Mike." Both "Juicy and Mike [] describe the experience of penetration, intercourse." The magazine was censored for "sexually explicit text about penetration." Months later, BCC staff sent that same magazine for review, which was rejected without further review according to a "spread sheet show[ing] prior censorship of the same item" (this is apparently the "ban list" plaintiff refers to in his complaint). The entire magazine was censored. (ECF #49-1, Ex. 1, 2, 3).

- Defendants Webber and Burris served together on TCC's censorship committee. They were tasked with reviewing "Players Girls Pictorial Magazine, which [plaintiff] ordered from vendors." The magazine, Volume 6, Number 2, contained a page with "a picture of a female with her hands on her clitoris[,] she appears to be masturbating." Text near the picture says "masturbating is the greatest thing in the world." On another page, there is a "picture of a female bent over [who] has her fingers in her vagina." The committee considered this to be inappropriate penetration and depiction of sexually explicit content, so the magazine was censored. Another edition of the magazine was also received—Volume 24, Number 4. This edition featured "a naked lady [with] her leg [] hyped up." She "has her fingers inserted into her vagina." Other pictures include "a female [who]

6

is inserting objects into her vagina" and "a female [who] is utilizing a vibrator on her clitoris." Once again, the magazine was censored for sexually explicit content. Both magazines were censored in total because "[e]xcising offending pages from magazines would breed friction[,] inmates would dispute staff's altering or destroying [of] their property." (ECF #61-1, Ex. 1, 2, 4, 5).

Critically, plaintiff does not dispute these facts, though he takes umbrage that he's not been permitted to see the offending materials for himself as confirmation. In fact, plaintiff never responds to defendants' statements of fact, which are therefore deemed admitted. *See, e.g., Davis v. Webb*, 2014 WL 1314938 at *1 (E.D. Mo. Mar. 28, 2014). Nor does he make a serious rebuttal to defendants' affidavits, having failed to substantiate any of his self-serving allegations with probative evidence. *See Hemingway v. Shelton*, 2019 WL 1586556 at *2 (E.D. Mo. Apr. 12, 2019). Given the posture of the parties' briefing and the lack of genuine dispute as to the nature of the censored content (there is no claim that defendants were lying about what they found in the magazines and catalogues), this Court proceeds in view that the at-issue material does, in fact, contain sexually explicit images and text as described.

## II. ANALYSIS

Prisoners retain certain rights under the First Amendment. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). However, "limitations may be placed on the exercise of those rights in light of the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population

7

are evaluated under a lesser standard of scrutiny in the context of a prison setting." *Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 982 (8th Cir.2004) (citing *Turner*, 482 U.S. at 81). When a prisoner's rights are implicated, the question becomes whether the actions of prison officials were "reasonably related to legitimate penological interests." *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (citing *Turner*, 482 U.S. at 89).

The Supreme Court in *Turner* articulated a four-factor test to consider when considering the reasonableness of the prison regulation: (1) a "valid, rational connection" must exist between the regulation and a legitimate, neutral governmental interest; (2) the existence of other means of exercising the asserted constitutional right; (3) the impact that asserting the right will have on prison personnel, other inmates, and the allocation of prison resources; (4) whether obvious and easy alternatives exist. 482 U.S. at 89–91. The existence of an "alternative that fully accommodates the prisoner's rights at de minimis costs to valid penological interests" is evidence of unreasonableness on the part of the state. *Id*. at 91. In balancing the rights of prisoners and institutional security, prison officials are afforded great deference. *Timm v. Gunter*, 917 F.2d 1093, 1098 (8th Cir.1990) (citing *Turner*, 482 U.S. at 85).

The Court considers each *Turner* factor below.

8

### A. A Rational Connection Between Prison Regulations and the Legitimate Government Interest of Censoring Sexually Explicit Material

SOP 13-1.2, the at-issue censorship regulation, seeks to establish a balance between "the reading and audio needs and preferences of offenders" and the "security needs and good order of the department's facilities." SOP 13-1.2 established a censorship committee that reviews sexually explicit and violent material for possible censorship. "sexually explicit material" is defined as "items which by their nature or content pose a threat or are detrimental to the security, good order, or discipline of the institution, offender rehabilitation, or facilitate criminal activity." Examples include "explicit sexual acts" like "intercourse, sodomy, fellatio, cunnilingus, or masturbation," as well as "sex acts" where one participant "appears to be non-consenting," where there appears "to be forceful [or] threatening [conduct]," or where "penetration is visible." What is *not* included is "material of a news or informational type, or material illustrative of medical, scientific, artistic, religious, educational, or anthropological content."

Each defendant "followed and applied [SOP] 13-1.2 in censoring" the at-issue magazines and catalogues in this case. Each was concerned about the various security threats that were posed by these magazines and catalogues if they were released for circulation—fighting between inmates, creation of a hostile work environment for facility personnel, inmate-on-inmate sexual violence,  and inappropriate conduct by inmates (exposing themselves, masturbating in public, etc.).

There is a legitimate government interest behind regulations denying sexually explicit material, a conclusion long drawn by the Eighth Circuit. *See Dawson v. Scurr*,

9

986 F.2d 257, 261 (8th Cir. 1993) (suggesting a sexually explicit publication "may be expected to circulate among prisoners" with the potential for "coordinated disruptive conduct"); *Harris v. Bolin*, 950 F.2d 547, 549 (8th Cir. 1991) (discussing security problems, such as fights, increased sexual activity, and destruction of property, which were caused by sexually explicit materials in prisoners' cells); *Carpenter v. South Dakota*, 536 F.2d 759, 763 (8th Cir. 1976) (concluding the receipt of sexually explicit materials would have a detrimental effect upon inmate rehabilitation); *see also Dean*, 325 Fed.Appx. 470 (facial challenge to regulation denying sexually explicit material denied where years of caselaw established that such regulation pursued a legitimate government interest). And the interest is properly "neutral," *Turner*, 482 U.S. at 90, where, "as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security." *Thornburgh*, 490 U.S. at 415. Each defendant made their decision based on concerns for prison security and "without regard to the content of the expression" itself. *Id*. Finally, it goes without saying that there is a valid, rational connection between SOP 13-1.2 (establishing guidelines and procedures to censor sexually explicit content) and the government's stated goals (to limit the circulation of sexually explicit content in the prison systems). To be sure, there is simply nothing "remote" as between the regulation and goal, here—no one is left guessing how SOP 13-1.2 achieves the government's interests. *Turner*, 482 U.S. at 89.

In light of the established caselaw and the undisputed facts of this case, this factor clearly favors defendant. The government's interests are legitimate, and a rational connection between the perceived harm and the responsive regulation clearly exists.

B**. Other Means Exist for Plaintiff to Exercise His First Amendment Rights**

*Turner* further asks the Court to consider whether "other avenues remain available for the exercise of the asserted right." 482 U.S. at 90. That depends on what right plaintiff is asserting he has. If it is to view pornographic material for its own sake, that answer is plainly no—it will be blocked every time by the legitimate concerns identified in SOP 13-1.2. But, plaintiff clarifies he has "a right to **non-obscene**, sexually explicit material." (emphasis added). Taken literally, SOP 13-1.2 allows for this outcome. It does not block *all* sexually explicit content, plenty of room is left for sexually explicit content that is of an "informational type," such as may be found in medical journals, scientific book, artistic magazines, educational treatises, religious texts, and anthropological studies. In the as-applied context here, defendants only censored material that showed plain examples of sexual acts—masturbation, penetration, literary depictions of oral and anal sex, and individuals utilizing sexualized toys—unhinged from any informational quality. Plaintiff suggests the censored models were "posing in a professional manner," but that betrays reality when the censored pictures are, instead, described as "a naked lady [with] her leg [] hyped up" who "has her fingers inserted into her vagina."

SOP 13-1.2 provides meaningful alternatives for viewing sexually explicit material; therefore, this factor favors defendants. *See Turner*, 482 U.S. at 92 (upholding regulation restricting correspondence between inmates at different state prisons, and rejecting argument that inmate should be afforded other means of communicating with those inmates, finding it sufficient that "all means of *expression*" were not blocked); *see also Josselyn v. Dennehy*, 333 Fed.Appx. 581 (1st Cir. 2009) (regulation banning

11

possession of sexually explicit material satisfied alternative means requirement where regulation "permits a broad range of [other] publications" to be received); *Jones v. Salt Lake Cty*, 503 F.3d 1147, 1156 (10th Cir. 2007) (accord).

### C. Others Will be Substantially Impacted By Plaintiff's Asserted Right

Next, *Turner* directs the Court to look to the impact of plaintiff's asserted right "on other inmates and prison personnel." As already discussed, defendants rightfully point to a variety of fears that unfettered access to sexually explicit material might create—all consistent with time-tested appellate authority. (ECF #43-1, Ex. 2; ECF #49-1, Ex. 2; ECF #61-1, Ex. 2). Such access "could lead to the bartering of sexually explicit materials" and possible "fights between inmates." *Mauro v. Arpaio*, 188 F.3d 1054, 1061 (9th Cir. 1999). It is also not outside of reason to expect a rise in "sexual harassment and a hostile work environment." *Id*. at 1062. It can also lead to "the disruption of the overall security and order of the prison, lead to staff complaints, and thwart sex offender rehabilitation." *Sperry v. Werholtz*, 413 Fed.Appx. 31, 41 (10th Cir. 2011); *Crozier v. Endel*, 446 Fed.Appx. 14, 15 (9th Cir. 2011) (accord); *Jones v. Salt Lake Cty*., 503 F.3d 1147, 1156 (10th Cir. 2007) (accord).

Reminded of the "considerable deference" afforded to "the determinations of prison administrators" in handling the "delicate problems of prison management," *Thornburgh*, 490 U.S. at 407, the Court will not haphazardly second-guess the sound rationale provided by defendants about the impact the prison system would face if plaintiff were to prevail. Without question, the impact would be significant—as

12

highlighted in caselaw across the country—and, as such, this factor also weighs in defendants' favor.

### D. Plaintiff Does Not Reveal an Obvious or Easy Alternative

Finally, determining whether alternative exists "is not a 'least restrictive alternative' test: officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91. Instead, if plaintiff "can point to an alternative that fully accommodates [his] rights at *de minimis* cost," the Court "may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id*. at 91.

Plaintiff's proposed solution seems to require prison officials to omit—either through black sharpie or careful scissor excision—all offending content while preserving the remainder of the magazine or catalogue. Defendants say this "is not a workable alternative" as it would "burden staff with extra work" and could lead to disputes and litigation by inmates arguing staff cut out too much or otherwise defaced their property.

Plaintiff's position has some credence, as found in Justice Stevens' concurrence in *Thornburgh*, 490 U.S. at 433 (Stevens, J. concurring). Justice Stevens criticized the "all-or-nothing rule," which allows rejection of an entire publication if even one page merited censorship, by questioning the bald assertion that "delivery of only a part of a publication would endanger prison security." *Id*. He added: "if, as the regulations' text seems to require, prison officials actually read an article before rejecting it, the incremental burden associated with clipping out the offending matter could not be of constitutional significance." *Id*. The majority explained that "when prison officials are able to

13

*demonstrate* that they have rejected a less restrictive alternative because of reasonably founded fears," they thereby satisfy *Turner*. *Id*. at 419. Accordingly, the majority left in place an unchallenged factual finding that demonstrated the utility of the all-or-nothing rule—a "reasonably founded fear" that "rejecting portions and admitting the rest of a publication would create more discontent than the current practice." *Id*. The posture of the case, though, reveals the Supreme Court upheld the regulation only as to a facial challenge, while remanding to the district court more than 46 as-applied challenges. *Id*. The fate of the all-or-nothing rule, then, remained uncertain following *Thornburgh*—certainly the Supreme Court did not declare any absolute preference for or against the rule when sending the case back to the district court for further findings.

 Fortunately, the Eighth Circuit has taken a fairly recent look at the all-or-nothing rule. "Tearing out specific pages of a specific publication containing prohibited material does not sound particularly difficult. Yet, when considered in the context of the review process of all incoming mail, the question becomes more complex." *Murchison v. Rogers*, 779 F.3d 882, 893 (8th Cir. 2015). Plaintiff, here, makes this keen observation apparent. He files a motion to "evaluate book contents" with an attached exhibit called "Side Chic 2." (ECF #108). He notes that "institution staff" gave him Side Chic 2 and seems to point out how SOP 13-1.2 is inconsistently applied since books like Side Chic 2 make it to him uncensored. Twenty-five pages in, the Court can only deduce that Side Chic 2 is probably an artistic expression—there are a few references to sexual encounters (mostly non-descriptive), and a *lot* of profanity, but nothing in those pages are of the sort referenced by defendants when they chose to censor other materials like "Plush XL Large

14

Ladies" that graphically portray penetrative sex. The problem of abandoning the all-or-nothing rule, as this Court has learned in practice, is that it forces the reviewer to read literally everything coming in to be reviewed—cover-to-cover—else sexually explicit material may inadvertently escape needed censorship.[1] In the case of Side Chic 2, that's 355 pages. Had the first twenty-five pages (or a page at random) contained sexually explicit content, the entire book could be censored, thereby saving the reviewer from reading the other 300+ pages. The burden of abandoning the all-or-nothing rule is manifest. Thus, as the Eighth Circuit has itself concluded, "we believe requiring such a change would have more than a *de minimis* impact." *Murchison*, 779 F.3d at 893.

This final factor also weighs in defendants' favor.

## III. CONCLUSION

The *Turner* factors clearly weigh in defendants' favor. On plaintiff's as-applied challenges, none of the defendants have violated his First Amendment rights. Thus, "[b]ecause there was no constitutional violation … the prison officials [are] also entitled to qualified immunity." *Murchison*, 779 F.3d at 893.  Defendants' motions for summary judgment will be granted.

Accordingly,

---

[1] Plaintiff frequently critiques MDOC with examples of sexually explicit material that has reached him or other inmates despite MDOC's censorship policy. The all-or-nothing rule certainly appears to assist MDOC in screening out offending material; but, as with all human experiences, it is not surprising to find that the censorship process is imperfect—sometimes prohibited material may slip past detection given the sheer volume of content to be reviewed. This does not, in the Court's view, demonstrate arbitrariness or a proclivity to single out plaintiff; rather, it merely demonstrates unavoidable imperfection in a human-driven process. See *Murchison*, 779 F.3d at 890 ("With the volume of material that must be screened, we cannot expect prison officials to perfectly screen all material that violates prison regulations.").

15

**IT IS HEREBY ORDERED** that plaintiff's Motions to Amend his Complaint (ECF #32, 38) are **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion to Dismiss Matt Sturm (ECF #39) is **GRANTED**. Accordingly, Sturm's Motion for Summary Judgment (#33) is **DENIED AS MOOT**. Sturm is **DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that defendant Terry Webb's Motion for Summary Judgment (#43) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Cindy Griffith's Motion for Summary Judgment (#49) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants Tim Burris and Cybelle Webber's Motion for Summary Judgment (#61) is **GRANTED**.

**IT IS FURTHER ORDERED** that all other pending motions (ECF #54, 55, 57, 58, 66, 67, 68. 70, 74, 76, 79, 80, 81, 82, 83, 85, 86, 89, 90, 95, 96, 97, 98, 99, 102, 105, 108, 111, 113, 114) are **DENIED AS MOOT**.

There being no remaining parties or claims, Judgment shall issue in defendants' favor.

So ordered this 13th day of August 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE